PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3340
_____

ST. LUKE'S HEALTH NETWORK, INC., DBA St. Luke's
University Health Network; SAINT LUKE'S HOSPITAL OF
BETHLEHEM, PENNSYLVANIA, DBA St. Luke's
University Hospital, Bethlehem Campus; ST. LUKE'S
QUAKERTOWN HOSPITAL; CARBON-SCHUYLKILL
COMMUNITY HOSPITAL, DBA St. Luke's Miners
Memorial Hospital; BLUE MOUNTAIN
HOSPITAL, individually and on behalf of all others similarly
situated, DBA St. Luke's Hospital, Palmerton Campus,
                                                            Appellants

v.

LANCASTER GENERAL HOSPITAL; LANCASTER
GENERAL HEALTH; UNIVERSITY OF
PENNSYLVANIA HEALTH SYSTEM; UNIVERSITY
OF PENNSYLVANIA TRUSTEES; JOHN DOE 1;
JOHN DOE 2
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. Action No. 5-18-cv-02157)
District Judge: Honorable Jeffrey L. Schmehl

_____

Argued March 31, 2020
_____

Before: GREENAWAY, JR., PORTER, and MATEY, *Circuit Judges*.

(Opinion filed:  July 22, 2020)

Brian W. Barnes    [ARGUED]
David H. Thompson
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, DC 20036

Douglas J. McGill
Webber McGill
760 Route 10
Suite 104
Whippany, NJ 07981
        *Counsel for Appellants*

Kevin W. Fay  [ARGUED]
Peter J. Hoffman
Jeffrey P. Lewis
Eckert Seamans Cherin & Mellott
50 South 16th Street
Two Liberty Place, 22nd Floor
Philadelphia, PA 19102
        *Counsel for Appellees*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge*.

This case involves a state-run program to reimburse Pennsylvania hospitals for treating indigent patients. Plaintiffs-Appellants are a group of hospitals and their related health care networks that seek civil remedies from Defendants-Appellees, another hospital and hospital system, for violations of the Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c)–(d). Plaintiffs allege that Defendants submitted fraudulent claims for reimbursement, in violation of the wire fraud statute, 18 U.S.C. § 1343, and received an unduly inflated proportion of the available funding. As a result, Plaintiffs claim they were reimbursed an artificially smaller share of funds. The District Court dismissed Plaintiffs' claims for lack of RICO standing, an additional requirement to Article III standing. It found that Plaintiffs failed to plead sufficient facts to demonstrate that their injury was caused by Defendants' alleged fraud.

Because we find Plaintiffs' theory of liability adequately alleges proximate causation, we will reverse the District Court and remand for further proceedings consistent with this opinion.

## I.      BACKGROUND

### A.      Tobacco Settlement Act and Extraordinary Expense Program

In 1998, Pennsylvania and forty-five other states entered into a master settlement agreement with certain cigarette manufacturers. As part of the settlement, the cigarette manufacturers disbursed funding to the states to cover tobacco-related health care costs. To allocate the funds to hospitals providing care to indigent patients, the Pennsylvania General Assembly enacted the Tobacco Settlement Act in 2001 (the "Act"). P.L. 755, No. 77 (codified at 35 Pa. Stat. § 5701.101 *et seq.* (2001)).

This case concerns the Hospital Extraordinary Expense Program ("EE Program") established under the Act. The EE Program reimburses participating hospitals for "extraordinary expenses" incurred for treating uninsured patients.[1] The amount each participating hospital receives is the lesser of "(1) the extraordinary expense claim[] or (2) the prorated amount of each hospital's percentage of extraordinary expense costs as compared to all eligible hospitals' extraordinary expense costs, as applied to the total funds available in the Hospital Extraordinary Expense Program for the fiscal year." 35 Pa. Stat. § 5701.1105(d) (2001). The latter recognizes that funds available through this program may not cover all extraordinary expenses that would be eligible for reimbursement in a fiscal

---

[1] As defined by the statute, "extraordinary expenses" are "the cost of hospital inpatient services provided to an uninsured patient which exceeds twice the hospital's average cost per stay for all patients." 35 Pa. Stat. § 5701.1102 (2001).

4

year. So, in fiscal years when the program does not have enough money to cover all of the extraordinary expenses of each participating hospital, the funds are distributed proportionally based on each hospital's share of reported extraordinary expenses.

The Act charges the Department of Human Services (formerly the Department of Public Welfare) ("DHS") with administering the EE Program. § 5701.1105(b). This includes the responsibility to determine the eligibility of each hospital for payment under the EE Program based on certain requirements under the Act. § 5701.1105(b)(4). A participating hospital must submit eligibility information and unpaid claims through the Pennsylvania Health Care Cost Containment Council's ("PHC4") website portal on a quarterly basis. DHS then calculates and makes EE Program payments to qualifying hospitals on an annual basis.[2] § 5701.1105(b)(5).

## B. Factual Background

The Pennsylvania Auditor General has audited the EE Program for each Fiscal Year since the Program's nascence. According to the Auditor General's Reports for Fiscal Years 2008-2012, some participating hospitals received disbursements for unqualified claims. For the years in which

---

[2] Although the Act requires DHS to pay the hospitals by October 1 of each fiscal year, the claims submitted were for services rendered a year or a year-and-a-half prior. Therefore, the references throughout this Opinion to a particular "fiscal year" are based on the year in which disbursements are made to participating hospitals rather than the year in which medical services were rendered.

the total amount of extraordinary expenses claimed by participating hospitals under the EE Program exceeded the total funds available in the EE Program, the Auditor General recommended, *inter alia*, that DHS claw back funds from the overpaid hospitals and redistribute the money to hospitals that had been underpaid.

DHS followed the Auditor General's recommendations for the fiscal years prior to Fiscal Year 2010. But DHS later found methodological discrepancies between DHS's and the Auditor General's eligibility determinations.[3] As a result, DHS decided to discontinue the claw-back process for Fiscal Years 2010-2012 and declined to reallocate EE Program funds for those years.[4]

---

[3] As justification for its decision to discontinue the claw-back procedure pursuant to the Auditor General's recommendations, DHS stated that "[n]either [the Tobacco Settlement Act nor the DHS's approved State Plan] requires [DHS] to recalculate and redistribute payments as updated information becomes available from hospitals after [DHS] has made its determination. . . . [S]uch a requirement would result in constant revision and recalculation of payment amounts for indefinite periods of time, which is a result seemingly inconsistent with the General Assembly's intent." App. 119.

[4] The Auditor General issued reports of a particular fiscal year several years after that fiscal year's disbursement. For example, the report of Fiscal Year 2010 was not released until 2014.

## C.    Procedural Background

Plaintiffs-Appellants are a group of hospitals and their related health care networks suing on behalf of all hospitals participating in the EE Program that the Auditor General deemed underpaid during Fiscal Years 2010-2012 (collectively, "Plaintiffs").  Plaintiffs commenced this action against Lancaster General Hospital ("Lancaster"), one of the allegedly overpaid hospitals, and its related hospital system and staff (collectively, "Defendants").    Plaintiffs claim Defendants conspired to defraud the Tobacco Settlement Act's EE Program in violation of RICO, 18 U.S.C. §§ 1961–1964. Plaintiffs seek civil remedies under 18 U.S.C. § 1964(c) ("civil RICO").    They also bring state-law claims for unjust enrichment and breaches of a constructive trust.

Specifically, Plaintiffs allege that John Doe 1 and John Doe 2, employees of Lancaster, "knew that [Lancaster's] claims were grossly inflated but nevertheless continued to submit them even after being called out by the Auditor General." App. 37.  They claim John Doe 1 instructed John Doe 2 to submit fraudulent claims through the PHC4 portal for Fiscal Years 2008-2012.  Plaintiffs contend that these actions amount to separate acts of wire fraud under 18 U.S.C. § 1343, a RICO predicate, and together the acts formed a pattern of racketeering activity under 18 U.S.C. § 1962(c).  According to Plaintiffs, these actions resulted in "massively inflated extraordinary expense claims," which unjustly enriched Lancaster by $9 million during Fiscal Years 2010-2012.[5]  App.

---

[5] Prior to DHS's discontinuance of the claw-back procedure, Lancaster repaid excess funds received in Fiscal Years 2008-2009 as directed by DHS.

47. Since participating hospitals submitted claims that totaled more than was available in EE Program funding for Fiscal Years 2010-2012, Plaintiffs claim they were collectively undercompensated by $9 million during those years.

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), contending, *inter alia*, that the alleged RICO violation did not proximately cause Plaintiffs' injury.[6]  The District Court agreed, granting Defendants' motion and dismissing for lack of civil RICO standing.  Having dismissed the civil RICO claim, the District Court declined to exercise supplemental jurisdiction over the state-law claims.  This appeal followed.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction over the RICO claims under 28 U.S.C. § 1964(c) and 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.  This Court has jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review over a district court's grant of a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. *Grier v. Klem*, 591 F.3d 672, 676 (3d Cir. 2010).  "[I]n deciding a motion to dismiss, all well-pleaded allegations of the complaint must be

---

[6] Defendants also moved to dismiss under Federal Rule of Civil Procedure 12(b)(1).  As we explain below, the District Court dismissed the civil RICO claim under Rule 12(b)(6).  Accordingly, we apply the Rule 12(b)(6) standard in reviewing the District Court's Order.

taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009). To withstand a Rule 12(b)(6) "motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

We also review de novo a legal determination regarding standing to pursue a civil action under § 1964(c) of RICO. *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000).

## III. DISCUSSION

We begin with an explication of RICO standing requirements. In light of these principles, we conclude that Plaintiffs' Complaint adequately claims that their injury was proximately caused by Defendants' allegedly fraudulent conduct. Since the District Court dismissed the civil RICO claim on standing grounds alone, we will remand to the District Court for further proceedings consistent with this opinion.

### A. Civil RICO Standing

Title 18 of the United States Code § 1964(c) provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." As distinct from Article III standing, a plaintiff bringing a civil RICO claim must additionally state an injury to business or property and "that a RICO predicate offense 'not only was a 'but for' cause of injury, but was the proximate cause as well.'" *Hemi Grp., LLC*

9

*v. City of New York*, 559 U.S. 1, 9 (2010) (citing *Holmes v. Sec. Inv'r Protection Corp.*, 503 U.S. 258, 268 (1992)); *see also In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 246 (3d Cir. 2012) ("In addition to meeting the constitutional standing requirements, 'plaintiffs seeking recovery under RICO must satisfy additional standing criterion set forth in section 1964(c) of the statute.'" (quoting *Maio*, 221 F.3d at 482)).

Similar to the antitrust context, proximate causation is employed in civil RICO as a limiting principle intended to stymie a flood of litigation, reserving recovery for those who have been directly affected by a defendant's wrongdoing. *See Holmes*, 503 U.S. at 268 ("[W]e use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."). But unlike its more generic definition at common law, "[o]ur precedents make clear that in the RICO context, the focus [of proximate causation] is on the directness of the relationship between the conduct and the harm" rather than "the concept of foreseeability." *Hemi Grp.*, 559 U.S. at 12 (2010).

The Supreme Court has also articulated three judicially practicable reasons for requiring directness of injury. First, "indirect injuries make it difficult 'to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors.'" *In re Avandia Mktg.*, 804 F.3d 633, 642 (3d Cir. 2015) (quoting *Holmes*, 503 U.S. at 269). Second, and relatedly, indirect injuries risk double recovery so the "courts would have to adopt complicated rules apportioning damages to guard against this risk." *Id.* Third, directly injured victims can be counted on and are best positioned to "vindicate the law as private attorneys general,"

so there is no need to extend civil RICO's private right of action to those whose injuries are more remote. *Holmes*, 503 U.S. at 269–70.

To demonstrate "some direct relation between the injury asserted and the injurious conduct alleged," the manipulation alleged must not be "purely contingent" on another event or action. *Id*. at 269, 271. Even though a plaintiff is not required to claim first-party reliance on a defendant's purported misrepresentation, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657–58 (2008), the cause of an injury that is "entirely distinct from the alleged RICO violation" may be too attenuated to meet the proximate causation requirement, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006). Relatedly, a more direct victim of the purported violation or independent, intervening factors may also break the chain of causation. *See Hemi Grp.*, 559 U.S. at 15; *Anza*, 547 U.S. at 458.

### B. Plaintiffs Meet the Proximate Causation Requirement for Civil RICO Standing

Applying these principles to the present case, we conclude that Plaintiffs have adequately stated that Defendants' alleged misrepresentation proximately caused their injury.

At the outset, it is important to specify the purported conduct constituting a RICO predicate and the resulting injury. The Complaint shows that Plaintiffs' theory of liability extends to Defendants' submission of allegedly fraudulent claims between Fiscal Years 2008-2012. Plaintiffs therefore claim collective injury in the form of a decreased proportion of EE Program funds during each of those years.

11

Defendants contend, and the District Court similarly mischaracterizes, Plaintiffs' injury as being based on DHS's discontinuance of the claw-back procedure after the Auditor General's Report of Fiscal Year 2010 was released in 2014. But this confuses Plaintiffs' allegations of injury with Plaintiffs' requested relief. Although true that the existence of the claw-back procedure and the reapportionment of funds for Fiscal Years 2008-2009 undermines claims for *relief* during that period, the allegations pertinent to the question of proximate cause are those of the purported *injury*. According to the Complaint, the injury traces back to submissions for Fiscal Year 2008. Indeed, Plaintiffs' injury appears to be based not on DHS's discretionary conduct to terminate the claw-back program for Fiscal Years 2010 and beyond, but on Defendants' allegedly fraudulent submissions for Fiscal Years 2008-2012.

Viewed in this light, it is clear that Plaintiffs' allegations mirror those in *Bridge v. Phoenix Bond & Indemnity Company*, in which the Supreme Court concluded the plaintiffs had met the proximate causation requirement to proceed under civil RICO. 553 U.S. at 648, 661. *Bridge* involved prospective buyers of tax liens sold by the Cook County, Illinois Treasurer's Office at public auction. *Id*. at 642. Because the structure of the bidding system permitted multiple prospective buyers to submit the winning amount, the County decided to "allocate parcels 'on a rotational basis' in order to ensure that liens [were] apportioned fairly among [the bid winners]." *Id*. at 643. To prevent a bidder from sending agents to bid the winning amount on their behalf, thereby obtaining a disproportionate share of liens, the County adopted the "Single, Simultaneous Bidder Rule," which required each entity to submit bids only in its own name. *Id*.

The plaintiffs in *Bridge*, a group of bidders, claimed that they were injured when the defendants, other bidding entities, committed mail fraud, a RICO predicate, by "arrang[ing] for related firms to bid on [the defendants'] behalf and direct[ing] them to file false attestations that they complied with the Single, Simultaneous Bidder Rule." *Id*. at 644. By collusively submitting winning bids, the defendants were able to collectively acquire a greater number of liens than would have been granted to a single bidder acting alone. The *Bridge* plaintiffs complained that the defendants' fraudulent submissions regarding compliance with the Single, Simultaneous Bidder Rule and their collusion deprived the plaintiffs of their fair share of liens and related financial benefits. *Id.*

The Supreme Court sided with the plaintiffs, concluding that they had adequately alleged a "direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles" even though the plaintiffs had not relied first-hand on the defendants' alleged mail fraud. *Id*. at 657–58.

Plaintiffs' theory of liability and alleged injury in the present case are nearly identical to that of the *Bridge* plaintiffs. Because the EE Program has a fixed pool of assets, Defendants' alleged manipulation to increase their share of the limited funding necessarily resulted in Plaintiffs receiving a decreased proportion of those assets. So, we must similarly conclude that Plaintiffs have adequately demonstrated proximate causation for purposes of civil RICO standing.

Moreover, Plaintiffs' theory of proximate cause satisfies the Supreme Court's three policy considerations for directness of injury. *See Holmes*, 503 U.S. at 269–70. First,

13

despite the District Court's conclusion that DHS was "the 'better situated plaintiff' that can 'generally be counted on to vindicate the law as private attorneys general,'" *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, No. 18-2157, 2019 WL 4393112, at *8 (E.D. Pa. Sept. 13, 2019) (quoting *Anza*, 547 U.S. at 460), DHS would not have been injured as a result of Defendants' misrepresentations.[7] Because DHS would not suffer harm at the hands of Defendants' alleged misrepresentations, it would have little incentive to investigate and vindicate any harms arising from any purported wrongdoing.[8]

Second, and relatedly, there is no concern of a double recovery by a better-situated plaintiff because no entity suffered any similar injury.[9] Moreover, Plaintiffs' purported

---

[7] Defendants' counsel conceded at oral argument that, assuming Defendants submitted inflated claims, DHS would suffer no harm.

[8] To the extent that Defendants' concern regarding DHS's potential loss of federal matching grants is raised in their briefing for the purpose of showing DHS's injury, this argument is a non-starter. Not only does DHS suffer no present injury, but any such harm would be the direct result of having to redistribute funds. Defendants' misrepresentations would actually be too remote a source of injury. *See Anza*, 547 U.S. at 458 (noting that where an injury is distinct from the alleged RICO violation, the relationship may be indirect).

[9] The District Court's reasoning that DHS could have but did not assess penalties for Defendants' alleged fraud, pursuant to 35 Pa. Stat. § 5701.1108 (2001), is immaterial. The wording of the statutory authority does not preclude other

damages are tangible and concrete, as opposed to the uncertain and ill-defined market-based injuries courts have typically rejected as supporting a direct relationship to the RICO violation. *See, e.g.*, *Anza*, 547 U.S. at 460 ("A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense.").

Third, since Plaintiffs request that Defendants remove the fraudulent claim amounts, recalculate the overall pool of claims submitted for Fiscal Years 2010-2012, and reapportion the EE Program funding among the participating hospitals, determining Plaintiffs' damages should not be unduly burdensome. *See In re Avandia Mktg.*, 804 F.3d at 642 (quoting *Holmes*, 503 U.S. at 269) (discussing how damages are often difficult to ascertain when the harms are indirect because other, independent factors may have contributed to the injury). At least on its face, damages appear to be no more difficult to quantify here than in other cases that this Court has permitted to go forward. *See, e.g.*, *id.* at 644 (finding no prohibitive difficulty in determining the overcharge amount for medications with misrepresented risks).

Defendants are more hesitant about the math. As indication of the confusion that lies ahead, they list the onerous

---

parties from seeking vindication of their rights. *See Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007) ("If a government's ability to penalize fraud knocked out private [RICO] litigation, then § 1964 would no longer apply when the predicate act is fraud, for governments always have some ability to detect and penalize frauds."), *aff'd*, 553 U.S. 639 (2008).

methodological differences between DHS's and the Attorney General's calculations and worry that the calculations will be prohibitively involved. They urge us to stop, as the District Court did, before we are "required to adopt complicated rules apportioning damages among Plaintiffs removed at different levels of injury from the alleged violative acts." *St. Luke's Health Network*, 2019 WL 4393112, at \*9. But this puts the cart before the horse. Whether methodological differences between the Auditor General's and DHS's analyses of claim submissions will even affect damages calculations is a question of fact to be resolved at a later stage of litigation. *See In re Avandia Mktg.*, 804 F.3d at 644 (noting that "the issue of [how to calculate the precise] damages, rather than demonstrating a lack of proximate causation, raises an issue of proof . . . ." which is "a question for another day"); *see also Anza*, 547 U.S. at 466–67 (Thomas, J., dissenting) ("We did not adopt the converse proposition that any injuries that are difficult to ascertain must be classified as indirect for purposes of determining proximate causation.").

Given that Plaintiffs have adequately alleged proximate causation, and because we find no "independent factors that account[ed] for [the plaintiffs'] injury . . . and no more immediate victim [was] better situated to sue," we will reverse the District Court. *Bridge*, 553 U.S. at 658.

## C.    Defendants' Alternative Arguments

The bulk of Defendants' briefing and oral presentation is devoted to three additional arguments, which Defendants had also raised in their motion to dismiss before the District Court: (1) Plaintiffs' allegations of a RICO predicate are implausibly based on inferences from the Auditor General's reports; (2) Plaintiffs' claims of fraud are not plausible because

16

the discrepancies between DHS's and the Auditor General's disbursement recommendations are entirely attributable to methodological differences; and (3) Plaintiffs lack any basis for asserting a cognizable or plausible injury because the EE Program funds are non-entitled funds. Since the District Court's decision to dismiss the civil RICO claim was based solely on the issue of proximate causation, we will limit our decision to reverse to that ground. We leave consideration of alternative arguments to the District Court upon remand.

## IV. CONCLUSION

Accordingly, we reverse the District Court and remand for further proceedings consistent with this opinion.