**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 21-1381

———————————

THE LEVY GROUP, INC.,

                                                    Appellant

v.

LAND, AIR, SEA AND RAIL LOGISTICS, LLC

———————————

On Appeal from the United States District Court
for the District New Jersey
(D.C. No. 3-20-cv-03839)
District Judge: Honorable Michael A. Shipp

———————————

Submitted Pursuant to L.A.R. 34.1(a) on
February 7, 2022

Before: GREENAWAY, JR., SCIRICA, and COWEN, *Circuit Judges*

(Opinion filed: April 13, 2022)

———————————

OPINION[*]

———————————

GREENAWAY, JR., *Circuit Judge*

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

## I. Introduction

Appellant challenges the District Court's determination that it failed to state a claim based on a lack of alleged economic duress. We agree with Appellant that the Complaint alleged sufficient facts from which an inference could be drawn that the memorandum of understanding at issue was executed under economic duress. We will reverse the District Court's ruling and remand for further proceedings in accordance with this opinion.

## II. Factual and Procedural History

### a. *The Levy Group, Inc. ("TLG") Complaint alleges the following facts:*

TLG is a family-owned garment manufacturing business. The corporation manufactures and wholesales coats, dresses, sportswear, and outerwear. Coats are 75 percent of its business. TLG's manufacturing cycle lasts nearly a year and a half, from August of one year to December of the next year. In August, TLG designs its coats in New York City then commissions samples to be manufactured abroad. Three months later, TLG receives its samples, and between November and February of the following year, it contracts with numerous large retail clients. Once under contract, TLG begins overseas manufacturing in December, which continues through May of the next year.

Between May and September, TLG receives its coats from overseas. These coats must then be stored in warehouses during the spring and summer pending shipment to clients in the fall. Generally, TLG's storage costs include fixed prices for each coat received "in" and shipped "out" as well as ancillary fees. Its storage agreements require

2

the warehouses to: (1) receive and hang the coats; and to (2) pick, pack, and ship the coats upon notice. Under the terms of TLG's retail contracts, if TLG fails to timely deliver the coats, it may be subject to late penalties, cancellations, or forced discounts. October through November is TLG's busiest shipping period.

TLG uses New Jersey warehouses to store its coats pending delivery to clients in the New York City metropolitan area. In 2018, Apex Apparel Services Company, Inc. ("Apex"), which TLG used for storage, had a maximum capacity of 350,000 coats on hangers with an annual throughput of 700,000 to 800,000.[1] In September of 2018, TLG learned that Apex would be unable to provide storage. Defendant Land, Air, Sea, and Rail Logistics, LLC ("LASR") expressed an interest in replacing Apex; thus, representatives from LASR and TLG met to discuss the terms of an agreement.

At the meeting, TLG explained to LASR the terms of the Apex contract. These terms included coats being received and stored on hangers with a railing system; TLG notifying the warehouse when to pick, pack, and ship coats; that there was a maximum storage need of 375,000 coats "at any given time" with an annual throughput of 700,000-800,000 coats; the number of employees needed to complete the work; the payroll for these employees; and current storage costs that TLG was paying. LASR was also advised of the penalties that TLG would incur if TLG's retail clients did not receive their

---

[1] The Complaint defines "throughput" as "the number of coats on hangers that [a warehouse] had stored throughout each of the prior seasons it warehouses coats for plaintiff." App. II, 20.

3

coats on time. In October 2018, LASR presented TLG with a rate quote, which TLG signed that December.

Pursuant to the agreement, the estimated annual throughput was 700,000 coats. TLG would pay $.70 per coat received "in" and $.60 per coat shipped "out." In exchange, LASR was to provide storage for approximately 375,000 coats on hangers. The intended in/out revenue for LASR was $910,000, and over a two-year term beginning in April 2019, the period of storage would last from April through November of each year.

Two months into the contract—June 2019—LASR contacted TLG to complain that it did not have space to house the contracted amount of coats. Three months later, LASR demanded that TLG remove its coats by November, pay an "out" fee per coat, and provide $32,000 in storage fees. As an alternative, LASR proposed that TLG pay $675,000. LASR also initiated an action in state court suing TLG for purported contract breaches.

In October, LASR demanded that TLG pay the total allegedly due ($120,029.45) and agree to other terms not a part of the initial contract. It also informed TLG that it had stopped shipping TLG's coats and conditioned resumption of shipping on TLG agreeing to increase the "out" fees from $.60 per coat to $2.10 per coat; paying a monthly storage fee of $40,000; reimbursing LASR for overtime pay; and limiting the daily maximum output of coats. LASR then upped the demand to add a payment of $66,397.60, which included a storage fee and other costs not covered in the initial contract.

4

When TLG did not comply, LASR ordered that TLG remove its entire inventory from LASR's warehouse within three days. LASR, once again, advised that it would only resume shipping TLG's coats if TLG executed another agreement. This time, the agreement was to pay an additional $127,872.80 not a part of the initial contract; limit the number of coats shipped and the hours between which the orders could be fulfilled; and "release all claims it had against [LASR] for its breach of the [initial contract]." *Id.*

To "preserve its reputation" and "meet its contractual obligations" to retail clients, TLG agreed to these terms. *Id.* The agreement was incorporated into a Memorandum of Understanding ("MOU") and signed by the parties in October 2019.

b. *Procedural History:*

Six months later, in April 2020, TLG sued LASR in federal court. TLG alleged breach of contract and breach of the implied covenant of good faith and fair dealing. LASR moved to dismiss the lawsuit on the grounds that the MOU, releasing all claims against LASR, was an enforceable settlement agreement. The District Court agreed, and it granted LASR's motion to dismiss the suit and enforce the MOU. The District Court summarily concluded that TLG had not "plead[ed] any facts that would allow [it] to invalidate the [MOU] based on . . . duress . . . ." App. I, 12 (first, second, and third alterations in original) (citation and internal quotation marks omitted).

We disagree with the District Court and will now reverse its ruling.

5

## III.    Discussion [2]

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a suit if the plaintiff fails to state a claim for which relief can be granted.  In deciding motions to dismiss, a court must take "all well-pleaded allegations" as true, interpret the allegations "in the light most favorable to the plaintiffs," and draw "all inferences" in favor of the plaintiffs.  *St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 299 (3d Cir. 2020) (internal quotation marks omitted) (quoting *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009)).  To overcome a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible if the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

New Jersey law defines economic duress as: (1) being induced by wrongful or improper pressure, and (2) "having little choice but to accede*." Cont'l Bank of Penn. v. Barclay Riding Acad., Inc.*, 459 A.2d 1163, 1175 (N.J. 1983) (citations and internal quotation marks omitted).  Further, the "acts or threats" need not be "criminal or tortious

---

[2] The District Court had jurisdiction over the proceedings under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.  We review de novo a district court's grant of a motion to dismiss. *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021) (citation omitted).  Likewise, we exercise plenary review over a district court's enforcement of a settlement agreement. *Tiernan v. Devoe*, 923 F.2d 1024, 1032 (3d Cir. 1991).

acts;" in other words they are not required to be wrongful "necessarily in a legal, but [instead] in a moral or equitable sense." *Id*. (citations and internal quotation marks omitted).

The Supreme Court of New Jersey has stated that economic duress might arise when "the payor has no immediate and adequate remedy in the courts . . . ." *Ross Sys. v. Linden Dari-Delite, Inc*., 173 A.2d 258, 261 (N.J. 1961) (citations omitted). But, since its decision in *Ross Systems*, the state's high court has clarified that New Jersey cases have "focused primarily on . . . (wrongful pressure) in determining whether economic duress has been established." *Cont'l Bank of Penn.*, 459 A.2d at 1175. Thus, "the 'decisive factor' is the wrongfulness of the pressure exerted." *Id*.

The District Court claimed that TLG did not plead facts that would allow it to invalidate the MOU based on economic duress.[3] On the contrary, there are factual allegations to this effect. Among other things, the Complaint's allegations include that LASR threatened to stop accepting and shipping TLG's goods unless TLG agreed to terms and fees not provided for in the original agreement. LASR in fact ceased shipping TLG's goods. The Complaint also states that LASR falsely accused TLG of being in breach of the Warehouse Agreement before demanding compliance with terms not a part

---

[3] The District Court confined its analysis to three conclusive statements that appeared near the end of the TLG Complaint. While a court must "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements," it must nonetheless still consider all "well-pleaded factual allegations" and "assume their veracity." *Oakwood Lab'ys, LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (citations and internal quotation marks omitted).

of the initial contract. These allegedly wrongful demands came during TLG's peak shipping season for its million-dollar contracts.[4] Besides the unilateral imposition of these additional terms, there is no question that TLG alleged inadequate consideration, a cornerstone of economic duress. *Quigley v. KPMG Peat Marwick, LLP*, 749 A.2d 405, 412 (N.J. Super. Ct. App. Div. 2000) ("[D]uress entails inadequate consideration.") (citing *Cont'l Bank of Penn.*, 459 A.2d at 1163).

LASR argues that TLG could have exercised "a myriad of options" during the prior state-court proceedings. Appellee's Br. at 11. For instance, TLG could have sought a temporary restraining order. *Id*. Even though duress might arise where there is no "adequate remedy in the courts," *Ross Sys.*, 173 A.2d at 261, the existence of a legal remedy is not the "decisive factor," *Cont'l Bank of Penn.*, 459 A.2d at 1175 (internal quotation marks omitted). Here, the Complaint alleges that LASR wrongfully ceased to perform its existing contractual obligations and unlawfully demanded new terms to their relationship. These allegations of wrongful conduct are the "decisive factor." *Cont'l Bank of Penn.*, 459 A.2d at 1175 (internal quotation marks omitted).

LASR's brief in opposition to this appeal also suggests that TLG was not subject to economic duress because TLG was, "at all relevant times," represented by competent counsel. Appellee's Br. 1, 8, 10, 11. At this stage of the litigation, this argument is

---

[4] TLG also alleged consequential damages including penalties and other charges it was required to pay to its retail clients. These alleged damages included $127,872.80 of charges above the initially-agreed-to amount; $19,250 to ship TLG's coats to a replacement warehouse; $284,683.30 to store the coats at the replacement warehouse; and $293,060.70 in late fees, penalties, and other charges from retail clients.

8

unpersuasive for at least two reasons. First, on a 12(b)(6) motion, a district court must interpret the complaint's allegations "in the light most favorable to the plaintiffs" and draw "*all* inferences . . . in favor of them." *St. Luke's Health Network, Inc.*, 967 F.3d at 299 (emphasis added) (citation and internal quotation marks omitted). Here, TLG alleged that LASR wrongfully reneged on the terms of the initial contract, stopped work at the peak of TLG's shipping season without lawful reason to do so, and conditioned resumption on compliance with terms not a part of the initial warehouse contract. Coupled with the stringent terms of its third-party retail contracts, the inference that can be drawn in the light most favorable to TLG is that TLG was compelled to agree to the MOU with LASR or face stiff, and perhaps even disastrous, consequences to its business.

Second, that TLG was represented by counsel also does not change our conclusion, because under New Jersey law the presence of counsel is not dispositive in proving economic duress claims. *S. P. Dunham & Co. v. Kudra*, 131 A.2d 306, 311 (N.J. Super. App. Div. 1957) (citation omitted) (explaining that "an opportunity to deliberate and consult" with counsel "should be taken into account in determining whether in fact the plaintiff made the payment voluntarily . . . [but] do[es] not of [itself] preclude relief"). Thus, economic duress could have occurred regardless of TLG having been represented by counsel.[5]

---

[5] LASR cites to our ruling in *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 911–12 (3d Cir. 1985) for the proposition that the presence of counsel "can vitiate an economic duress claim." Appellee's Br. at 10. In *Harsco Corp.*, we reviewed a claim of economic duress arising under Pennsylvania law, not New Jersey law. 779 F.2d at 909–10. Further, as the word "vitiate" suggests, the presence of counsel may be relevant to analyzing whether economic duress occurred, but it is not necessarily dispositive.

As a final matter, we must note that the District Court's reliance on unpublished cases such as *Nayak v. McNees Wallace & Nurick LLC*, 700 F. App'x 172 (3d Cir. 2017) and *Oliver v. Wincor Nixdorf Corp.*, No. 15-2921, 2018 WL 515855 (D.N.J. Jan. 23, 2018) is misplaced. First, in *Nayak*, we applied Pennsylvania law, not New Jersey law. Second, in *Oliver*, the court disposed of the case at the summary judgment phase, whereas here the district court was presented with a motion to dismiss.[6]

## IV.     Conclusion

As required by New Jersey law, the factual allegations in the TLG complaint sufficiently allege that TLG's "financial difficulty" "was contributed to or caused by" LASR's allegedly wrongful actions. *Cont'l Bank of Penn.*, 459 A.2d at 1175 (citation and internal quotation marks omitted). Given our standard on a motion to dismiss, that standard is certainly met here. *St. Luke's Health Network, Inc.*, 967 F.3d at 299 (3d Cir. 2020) (citation omitted). For the foregoing reasons, we will reverse the District Court's ruling and remand for further proceedings in accordance with this opinion.

---

[6] Yet, even at the summary judgment stage, New Jersey case law directs that its courts "should be particularly hesitant in granting summary judgment where questions dealing with subjective elements such as intent, motivation and *duress* are involved." *Shanley & Fisher, P.C. v. Sisselman*, 521 A.2d 872, 878 (N.J. Super. Ct. App. Div. 1987) (emphasis added). Hence, given the procedural posture of a motion to dismiss, we should be more circumspect in considering a dispositive resolution.