**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-1472**

───────────

ASHLEY ALBERT; ASHLEY BAXTER; KARINA JAKEWAY; MELINDA JABBIE, on behalf of themselves and all others similarly situated,

Plaintiffs − Appellants,

v.

GLOBAL TEL*LINK CORP.; SECURUS TECHNOLOGIES, LLC; 3CINTERACTIVE CORP.,

Defendants – Appellees.

───────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Lydia Kay Griggsby, District Judge. (8:20−cv−01936−LKG)

───────────

Argued:  January 26, 2023                     Decided:  May 25, 2023

───────────

Before DIAZ and THACKER, Circuit Judges, and Catherine C. EAGLES, United States District Judge for the Middle District of North Carolina, sitting by designation.

───────────

Vacated and remanded by published opinion.  Judge Diaz wrote the opinion, in which Judge Thacker and Judge Eagles joined.

───────────

**ARGUED:** George Fuad Farah, HANDLEY FARAH & ANDERSON PLLC, New York, New York, for Appellants.  Jason Robert Scherr, MORGAN LEWIS & BOCKIUS, LLP, Washington, D.C., for Appellees.  **ON BRIEF:** Benjamin D. Brown, Robert A. Braun, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., for Appellants. Jonathan B. Pitt, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellee

3Cinteractive Corp. Jonathan I. Gleklen, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellee Global Tel*Link Corp.

———————

DIAZ, Circuit Judge:

Plaintiffs Ashley Albert, Ashley Baxter, Karina Jakeway, and Melinda Jabbie appeal the district court's dismissal, under Federal Rule of Civil Procedure 12(b)(6), of their Racketeer Influenced and Corrupt Organizations Act ("RICO") claims. The district court held that Plaintiffs failed to allege that Defendants Global Tel*Link Corp. ("GTL"); Securus Technologies, LLC; and 3Cinteractive Corp. ("3Ci") proximately caused Plaintiffs' injuries. But we hold that Plaintiffs have pleaded facts that satisfy RICO's proximate-causation requirement, as explained in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008). So we vacate the district court's dismissal and remand for further proceedings.

I.

A.

Plaintiffs' complaint alleges the following, relevant to the RICO claims on appeal.

GTL and Securus are the largest providers of inmate calling services, which allow those serving time in prison or jail to communicate with the outside world. GTL and Securus are competitors. 3Ci works with GTL and Securus by providing marketing services, processing charges to consumers, and managing GTL's and Securus's websites.

Friends and family members can receive calls from inmates by setting up an account with the correctional facility's calling-services provider. An account allows call recipients to be charged at a per-minute rate set by a contract between the provider and the state or local government that operates the facility. In 2017, the average price of a charged-per-

3

minute call from an inmate in a state prison lasting 15 minutes was about $1.87, or less than $0.13 per minute.

Along with setting per-minute rates, contracts between providers and governments also establish a (typically percentage-based) "site commission" that the provider pays to the government for each call. Traditionally, the site commission for a per-minute call is about 50% of the total price of the call.

In 2010, Securus launched a "single call" program to supplement its per-minute offering. With Securus's single-call program, a consumer could pay a single flat fee per call rather than being charged by the minute. The single-call option lets consumers skip the step of setting up an account.

But Securus's single calls are more expensive than per-minute calls: Each single call costs $14.99 (up to 15 minutes) or $9.99 (up to 10 minutes). And governments receive proportionally smaller site commissions for these calls. Unlike per-minute calls, where site commissions averaged around 50% of the price of the call, site commissions for single calls are a flat $1.60 for each $14.99 call and $0.30 for each $9.99 call.

After Securus launched its single-call offering, GTL developed its own. GTL at first offered single calls at a lower price: a flat $3 fee on top of the per-minute rate. So a 15-minute call under GTL's early single-call platform would typically cost less than $5.

When government agencies were reviewing bids during this time, most would choose GTL over Securus because GTL's single calls were cheaper. But rather than lowering its own prices to stay competitive, Securus colluded with GTL (through 3Ci) to fix single calls at Securus's higher price.

4

And indeed, in 2013, GTL scrapped its lower-priced single-call offerings and replaced them with $14.99 and $9.99 single-call offerings that are functionally identical to Securus's. Even GTL's site commissions were the same as Securus's. The result was that Securus's and GTL's bids to governments were effectively indistinguishable. While Securus and GTL entered contracts with governments on a jurisdiction-by-jurisdiction (or facility-by-facility) basis, the prices and site commissions were non-negotiable. So Securus's and GTL's contracts all provided for the same single-call prices and site commissions, nationwide.

When reviewing GTL's and Securus's now largely identical bids, governments would often ask why single-call prices were so high (and site commissions so low). Plaintiffs allege that Securus and GTL falsely claimed that most of the price consumers paid went to 3Ci as unavoidable transaction costs. So Securus and GTL had to charge high prices (and pay low site commissions) to be profitable, they said. In fact, only a small sum of the price went to 3Ci. After paying the site commission, Securus and GTL pocketed the balance of the inflated price.[1]

The complaint cites declarations from unnamed former Securus and GTL executives to corroborate this scheme of misrepresentations to government agencies. The declarants state that if the governments knew the truth (that only a small portion of the price went to 3Ci), they would demand lower prices for consumers and higher site commissions for

---

[1] The complaint also alleges that Defendants made misrepresentations directly to consumers. But the district court rejected that theory and Plaintiffs don't defend it on appeal. They instead rely on the alleged misrepresentations to government entities.

themselves. And GTL and Securus would be forced to accede to those demands to remain competitive.

Defendants kept up this scheme for as long as they could, but by 2018, Securus and GTL began phasing out single calls, in part because of governments' opposition to the high prices and low site commissions. But some facilities still use Securus's and GTL's single-call products because the facilities don't yet have new inmate-calling-services contracts.

B.

Plaintiffs are consumers who used Securus's or GTL's single-call products. They sued under the Sherman Antitrust Act and RICO, alleging that Defendants illegally conspired to inflate the price of single calls, and in the process, materially misrepresented the amount of their transaction costs to justify the high consumer prices and low site commissions.

The district court dismissed Plaintiffs' RICO claims, holding that their theory of liability was "too remote to establish proximate cause" because their injuries "are contingent on, or derivative of, harm suffered by a third party—namely, the contracting governments." *Albert v. Glob. Tel\*Link Corp.*, No. 20-CV-01936-LKG, 2021 WL 4478696, at \*10 (D. Md. Sept. 30, 2021). And Plaintiffs could not state a claim by "speculat[ing] about what actions the contracting governments might have taken if [D]efendants had not made the alleged misrepresentations and/or omissions," the court explained. *Id.* at \*10 n.6. So it dismissed the RICO claims with prejudice. But it declined to dismiss Plaintiffs' claims under the Sherman Antitrust Act.

6

The district court then granted Plaintiffs' motion to certify the partial dismissal as a final judgment under Federal Rule of Civil Procedure 54(b).[2]  This appeal followed.

## II.

### A.

Accepting Plaintiffs' factual allegations as true, we hold that the complaint states a plausible RICO claim.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs have sufficiently alleged proximate causation under *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) (holding that bidders at a county tax-lien auction plausibly alleged RICO proximate causation when they lost to a competing bidder who lied to the county about complying with the auction's rules).

Plaintiffs allege a scheme in which Defendants directly injured both consumers and governments in tandem.  And as we explain, the alleged RICO violation is no less logically related to Plaintiffs' injuries than in *Bridge*.

### B.

RICO establishes a private right of action for anyone "injured in his business or property by reason of a violation of" RICO's criminal provisions.  18 U.S.C. § 1964(c).  The phrase "by reason of" requires a "direct relation" between the plaintiff's injury and the defendant's RICO violation.  *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992).

---

[2] Plaintiffs also sought to amend their complaint to shore up their proximate-cause allegations.  They appeal the district court's denial of that motion.  But because we vacate the dismissal, we need not decide whether the district court properly denied leave to amend.

With no precedent that definitively resolves the question here, we distill principles from the Supreme Court's (and our) cases applying *Holmes*'s "direct relation" test. In short, RICO proximate causation is lacking when (1) there is a "more direct victim" from whom (or intervening factor from which) the plaintiff's injuries derive, or (2) the alleged RICO predicate violation is "too distinct" or logically unrelated from the cause of the plaintiff's injury. *See Saint Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 301 (3d Cir. 2020) ("[T]he cause of an injury that is entirely distinct from the alleged RICO violation may be too attenuated to meet the proximate causation requirement. Relatedly, a more direct victim of the purported violation or independent, intervening factors may also break the chain of causation." (cleaned up)).

As we explain, Plaintiffs' complaint suffers from neither deficiency. We turn first to *Holmes* and the "more direct victim" category.

## C.

The "more direct victim" cases illustrate that a plaintiff can't show RICO proximate cause when the plaintiff's injuries derive from those suffered by parties more closely or directly victimized by the defendant's wrongdoing. As the Sixth Circuit put it, these cases involve "plaintiffs who suffer derivative or 'passed-on' injuries." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004).

*Holmes* was such a case. There, Robert Holmes conspired to manipulate stock, causing two broker-dealers to go out of business. 503 U.S. at 261. Those broker-dealers then couldn't pay their customers' claims, triggering the plaintiff Securities Investor

8

Protection Corp.'s insurer-like obligations to make good on the customers' losses.[3] *Id.* at 262.

SIPC sued Holmes, but the Supreme Court held that RICO demanded a "direct" relationship between the RICO violation and the plaintiff's injury. *Id.* at 262, 269. And the customers' (and SIPC's) losses were directly caused by the broker-dealers going out of business—not by Holmes's stock manipulation. *Id.* at 271. So SIPC couldn't establish proximate causation because the customers' injuries were derivative of those suffered by the broker-dealers. *Id.*; *see also Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 494 (4th Cir. 2018) (finding no proximate causation because the subcontractor's alleged RICO injury—not being fully paid for its work in repairing flood damage—was derivative of the property owner's own loss from being underpaid by its insurer, which illegally undervalued the owner's claim).

On the way to its holding, *Holmes* articulated three principles supporting a direct-relationship requirement: First, "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." 503 U.S. at 269. Second, allowing claims by "plaintiffs removed at different levels of injury from the violative acts" would increase the "risk of multiple recoveries." *Id.* Third, there's no need to get into such complicated inquiries

---

[3] The Securities Investor Protection Corp., or SIPC, is a "private nonprofit corporation" comprised of registered broker-dealers that appoints a trustee to administer claims whenever a broker-dealer "has failed or is in danger of failing to meet its obligations to customers." *Holmes*, 503 U.S. at 261 (cleaned up).

9

when "directly injured victims can generally be counted on to vindicate the law as private attorneys general." *Id.* at 269–70.

## D.

The "too distinct" cases demonstrate that there's no proximate cause when the alleged RICO violation is too logically unrelated to the direct cause of a plaintiff's injuries.

*Anza v. Ideal Steel Supply Corp.* illustrates. There, Ideal alleged that its competitor violated RICO by deliberately failing to charge taxes on cash transactions and submitting false tax returns to hide the scheme. 547 U.S. 451, 454 (2006). This put Ideal at a competitive disadvantage, causing it to lose customers and sales to the defendant. *Id.*

The Supreme Court held there was no RICO proximate causation because the alleged violation (submitting false tax returns) defrauded the state, but Ideal's injury came from losing customers, which was too distinct from the tax fraud. *Id.* at 457–58. In fact, the parties directly causing Ideal's injury—customers—were different from the party committing the RICO violation—the defendant. *See id.* at 458; *see also Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 11 (2010) (holding that the defendant retailer's failure to make state-law-required disclosures that would make it easier for the City to recover delinquent taxes did not proximately cause the City's injury, which more directly came from the delinquent taxpayers themselves).

## E.

Unlike the cases discussed above, in *Bridge v. Phoenix Bond & Indemnity Co.*, the Supreme Court held that a plaintiff plausibly pleaded RICO proximate causation. 553 U.S. 639, 658 (2008). *Bridge* involved an annual auction to sell tax liens on parcels of land to

10

bidders willing to accept the lowest penalty rates. *Id.* at 642. Because the tax liens were so valuable, it was common for multiple buyers to bid the lowest penalty rate available, 0%. *Id.* at 642–43.

To ensure that parcels were apportioned fairly among 0% bidders, the county government required all potential buyers to certify that they would submit only one bid per parcel and wouldn't engage agents to submit duplicative 0% bids for the same parcel. *Id.* at 643. But several bidders did just that, falsely certifying to the county that they would follow the single-simultaneous-bidder rule. *Id.* at 644. As a result, they won a disproportionate share of tax liens at the expense of other bidders who followed the rules. *Id.* As part of its scheme, the defendants mailed state-law-required notices to the property owners; this mail fraud was the RICO predicate. *Id.* at 644–45.

The Supreme Court rejected the argument that a RICO claim based on mail fraud requires reliance by a plaintiff. *Id.* at 649. The Court also held that the innocent bidders' injuries were "the direct result" of the fraud because they were "a foreseeable and natural consequence of [the defendants'] scheme to obtain more liens for themselves." *Id.* at 658. In fact, the innocent "bidders were the *only* parties injured" by the scheme. *Id.*

The Court didn't discuss whether it would be difficult to discern which tax liens the innocent bidders lost because of the scheme. Nor did it expressly analyze whether the RICO violation, mailing notices to property owners, was too distinct from the defendants' act of duping the county to submit multiple bids. But the Court appears to have considered both actions by the defendants to be part of the same fraudulent scheme.

11

III.

Applying these principles, we hold that this is neither a "more direct victim" case nor a "too distinct" case.  Rather, Plaintiffs have alleged proximate causation under *Bridge*.

A.

Unlike in *Holmes* and *Slay's Restoration*, Plaintiffs' injuries (paying inflated prices) don't derive from an injury to a party closer to Defendants in the chain of causation.  While the alleged misrepresentations to the governments happened before Plaintiffs' payment of inflated prices, *Bridge* illustrates that this doesn't make the governments more direct victims.

And as Plaintiffs point out, the governments' injuries could be cured if Defendants paid higher site commissions—even if Plaintiffs paid the same inflated price.  So Plaintiffs' injuries aren't derivative of those suffered by the governments.  Rather, Plaintiffs and the governments are both direct victims.  *Cf. Mid Atl. Telecom, Inc. v. Long Distance Servs., Inc.*, 18 F.3d 260, 263–64 (4th Cir. 1994) (holding that the same fraudulent scheme could produce two classes of direct victims: customers and competitors).[4]

---

[4] *Mid Atlantic Telecom* predates *Anza*.  But it nonetheless illustrates that plaintiffs can be one of multiple groups of victims directly injured by the same RICO scheme.  *See also Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 652 (9th Cir. 2019) (holding that defendant's fraudulent requests for an agency to investigate defendant's competitor made both the agency and the competitor direct victims); *accord Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1258 (9th Cir. 2019) ("[T]he fact that individual patients and [third-party payors] both suffered economic injuries from a drug manufacturer's fraudulent scheme does not mean that one group of plaintiffs should be favored to recover over the other.").

12

Nor is this a case in which the RICO violation is "too distinct" from Plaintiffs' injuries. Unlike *Anza* and *Hemi Group*, the alleged RICO violation (misrepresentations to the governments, via mail and wire communications) and the cause of Plaintiffs' injuries (charging inflated prices) were both committed by the same parties—Defendants. So this case is more like *Bridge*. And the mail and wire fraud were part of the same scheme that triggered—and were even more logically related than in *Bridge* to—the inflated prices Plaintiffs paid.

The meaningful parallels to *Bridge* don't end there. Plaintiffs allege a RICO-violating scheme that first required Defendants to trick government entities, which led to their own independent injuries. This was good enough for *Bridge* to hold that the plaintiffs' injuries were the "direct result" of the defendants' scheme. 553 U.S. at 658. So too here.

B.

The three principles underlying *Holmes*'s "direct relation" test further support our decision.

First, it's true that Plaintiffs may eventually confront the "difficult" task of "ascertain[ing] the amount of [their] damages attributable to the violation, as distinct from other, independent factors." *Holmes*, 503 U.S. at 269. But that task is no harder here than it would have been in *Bridge*. *See* 553 U.S. at 657–58.

There, to attribute its damages to the defendants' fraud, the innocent bidders would have to show which tax liens they would have won but for the scheme—and the value of those liens. This showing is at least as arduous as what Plaintiffs may eventually have to

13

prove (that is, how much less than $14.99 or $9.99 they would have paid absent Defendants' alleged scheme).

In any event, such damage-calculation hurdles present questions of fact that can't be resolved at the pleading stage. *See, e.g.*, *Saint Luke's Health Network*, 967 F.3d at 303 (defendants' "hesitat[ion] about the math . . . puts the cart before the horse," as methods for calculating damages present "a question of fact to be resolved at a later stage of litigation"); *accord Painters & Allied Trades*, 943 F.3d at 1251 ("[W]e are not persuaded that [damage calculation] is so difficult here that Plaintiffs should be denied the opportunity to prove their damages.").

Second, the complaint's causation theory presents "no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation." *Bridge*, 553 U.S. at 658. As explained above, the contracting governments' injuries of losing higher site commissions is logically independent of Plaintiffs' injuries of paying inflated prices. Plaintiffs' compensatory damages (a refund of the amount they wouldn't have paid but for Defendants' fraud) is separate from the sum Defendants should have paid to the governments in site commissions. So if the government entities later sued Defendants, their slice of the pie would differ from that owed to Plaintiffs.

Finally, "no more immediate victim is better situated to sue." *Bridge*, 553 U.S. at 658. The government entities may have their own parallel RICO claims they could assert against Defendants, but they're no better situated than Plaintiffs.

C.

14

Next, we address the district court's holding (and Defendants' argument) that Plaintiffs' theory relies on speculation about what the contracting governments would have done but for the alleged misrepresentations. But at this stage, Plaintiffs need only allege facts plausibly supporting a reasonable inference of causation. And the complaint plausibly supports an inference that governments would have demanded lower prices for consumers but for Defendants' misrepresentations.

For instance, Plaintiffs allege that governments awarded inmate-calling-services contracts based, at least in part, on consumer prices; that former Securus and GTL executives believed governments would have demanded lower prices if they'd known the truth about transaction costs; that governments routinely questioned the consumer prices; that honest competition would have driven the price downward; and that Securus and GTL phased out single calls, in part because of incessant pressure from governments about prices. These allegations, taken as true, carry Plaintiffs' claim across the line from speculative to plausible.

Relatedly, the parties dispute whether Plaintiffs can distinguish *Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524 (D. Md. 2019), which the district court cited in its dismissal order. In *Rojas*, the defendant airlines charged all passengers a Mexico Tourism Tax, even when certain passengers were exempt. *Id.* at 531. The plaintiffs alleged that the airlines conspired to pocket refunds that belonged to exempt passengers. *Id.* at 536.

The district court granted the airlines' motion to dismiss, primarily based on the plaintiffs' failure to allege a RICO enterprise and a RICO pattern—which aren't at issue here. *Id.* at 538–40. But the court also included a paragraph of proximate-cause analysis,

15

holding that the plaintiffs were merely "assuming" that "the Mexican government would have dismantled Defendants' alleged scheme," which was too speculative a theory. *Id.* at 542.

But unlike the *Rojas* plaintiffs, Plaintiffs don't rest their claim on a mere assumption; they allege the facts outlined above, including the expected testimony of former executives. At any rate, *Rojas* isn't binding; we read the binding precedent (*Bridge*) to support Plaintiffs.

## IV.

Finally, we decline Defendants' invitation to affirm the dismissal of 3Ci on the ground that the complaint fails to allege that it violated RICO. To the contrary, the complaint alleges wrongdoing by 3Ci that's part of Defendants' overall RICO-violating scheme. *See, e.g.*, J.A. 28–29, 77 (3Ci communicates misrepresentations to government entities through its websites promoting Securus's and GTL's single-call products); J.A. 30 (3Ci colluded to fix prices).

3Ci may be able to show at summary judgment that it wasn't involved in the alleged scheme. But the complaint plausibly alleges otherwise, so for now, 3Ci rises or falls with the other Defendants.

*VACATED AND REMANDED*

16